**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 03 2014, 9:29 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JILL M. ACKLIN**
Acklin Law Office
Westfield, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE INVOLUNTARY TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF A.C., MINOR CHILD, AND HIS FATHER, M.C., | ) ) ) ) ) |
| M.C., | ) ) |
| Appellant-Respondent, | ) ) |
| vs. | ) No. 49A02-1308-JT-671 |
| | ) |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) |
| Appellee-Petitioner. | ) ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Marilyn A. Moores, Judge
The Honorable Larry E. Bradley, Magistrate
Cause No. 49D09-1303-JT-8939

**March 3, 2014**

**BRADFORD, Judge**

Appellant-Respondent M.C. ("Father") appeals the juvenile court's order terminating his parental rights to A.C. ("Child"). Father alleges that the Indiana Department of Child Services ("DCS") did not provide sufficient evidence to support the juvenile court's findings that the conditions which resulted in Child's placement outside of his home were not likely to be remedied and that continuation of the parent-child relationship posed a threat to Child's well-being. Concluding that the evidence was sufficient to support the termination of Father's parental rights, we affirm.

## FACTS AND PROCEDURAL HISTORY

Child was born on September 1, 2008. On November 19, 2010, DCS filed a petition to have Child found a child in need of services ("CHINS"), alleging that Father was incarcerated for domestic battery and robbery, Mother was homeless and living in a shelter, Mother could not provide for Child's basic needs, and Father had demonstrated neither the ability nor the willingness to parent Child. On December 13, 2010, Child was found to be a CHINS. On January 10, 2011, the juvenile court held a dispositional hearing during which it ordered Mother to participate in reunification services, to wit: Mother was to obtain stable income and housing, participate in home-based counseling, and establish Child's paternity. At some point, apparently in October of 2011, a petition to terminate Mother's and Father's parental rights was filed.

On September 10, 2012, Father established paternity of Child. That same day, the juvenile court issued an order, in which it noted that the petition to terminate Mother's and

Father's parental rights had been dismissed and that "Father was released from DOC in July and DCS wanted to give father an opportunity to participate in services." DCS Ex. 45 p. 1. The juvenile court ordered that Father participate in a domestic violence assessment and follow all recommendations, complete a substance abuse evaluation and follow all recommendations, continue with home-based counseling, complete a parenting assessment and follow all recommendations, work towards earning a GED, and participate in the Fathers and Families Program.

Six months later, the State filed another petition to terminate Mother's and Father's parental rights to Child ("the TPR petition"). On July 8, 2013, the juvenile court held an evidentiary hearing on the TPR petition. DCS family case manager Michelle Jeffries ("FCM Jeffries"), who took over Child's case in March of 2011, testified at the hearing. FCM Jeffries testified that she made referrals for services for Father upon his release from incarceration in July of 2012, including a parenting assessment, home-based therapy, home-based case work (including visitation), a domestic violence assessment, and the Fathers and Families Program and later made a referral for a substance abuse assessment. Father did not complete the domestic violence assessment and, although he did complete the parenting assessment and substance abuse assessment, he failed to complete a subsequently-referred intensive out-patient program. Father inconsistently attended Fathers and Families and failed to complete the twelve-week program.

After July of 2012, Father lived with either his girlfriend or his brother, but Father never provided an address for either home to FCM Jeffries, who offered more than once to

3

visit his residence to see if Child could be allowed to visit or potentially move in at some point in the future. Although Father told FCM Jeffries that he was working in construction through his father's business, he never provided any proof of income. Father participated in some home-based therapy and did have consistent parenting time with Child from July of 2012 until February of 2013, when he was again incarcerated.

DCS also presented evidence regarding Father's criminal history at the termination hearing. On November 24, 2009, Father was arrested for Class A misdemeanor criminal trespass and Class B misdemeanor disorderly conduct. On January 26, 2010, Father was incarcerated pending trial for two counts of Class B felony Robbery, Class B felony criminal confinement, and Class D felony pointing a firearm. On July 7, 2010, Father was sentenced to four years of incarceration for Class C felony robbery, a sentence later modified to home detention. Father was incarcerated from September 14, 2010, to November 29, 2010, for Class D felony strangulation, Class D felony escape, Class D felony domestic battery, Class A misdemeanor domestic battery, Class A misdemeanor battery, Class A misdemeanor intimidation, and Class A misdemeanor interfering with the reporting of a crime. Father's home detention sentence for his robbery conviction was revoked and he was also convicted and sentenced for Class D felony escape.

As a result of all of these convictions and arrests, Father was incarcerated from November 29, 2010, to July 19, 2012. On February 25, 2013, Father was arrested for two counts of Class B felony possession of a firearm by a serious violent felon, Class D felony receiving stolen property, and Class A misdemeanor carrying a handgun without a license.

4

Father was incarcerated at the time of the termination hearing, and his latest criminal case was scheduled to go to trial on August 22, 2013.

FCM Jeffries testified that Child had been in the same pre-adoptive foster home for more than two-and-one-half years, that he had bonded with his foster family, and that all of his needs were being met. FCM Jeffries opined that the adoption of Child by his foster family was in his best interests and that Father was not likely to remedy the conditions that resulted in removal because he did not complete services even when the urgency of doing so was stressed to him. Guardian ad litem Jamie Walden ("GAL Walden") agreed that adoption was in Child's best interests, based on Parents' failure to complete services, Parents' failure to be a stable part of Child's life, the length of time Child had been in foster care, and that fact that his foster home was the only place Child had experienced stability. GAL Walden testified that she had never been able to recommend reunification and that she did not recommend that Father be given more time to complete services.

On July 25, 2013, the juvenile court issued its order terminating Father and Child's parent-child relationship. The order provides in relevant part as follows:

> 1. [Mother] is the mother, and [Father] is the father, of [Child], a minor child born on September 1, 2008.
> 2. A Child in Need of Services Petition "ChINS" was filed on [Child] on November 19, 2010, … based on allegations of instability and his mother having an untreated medical condition that hindered her ability to parent. Allegations against [Father] included his ability or willingness to parent was unknown, and he was incarcerated.
> 3. [Child] was found to be in need of services on December 13, 2010.
> 4. On January 10, 2011, the ChINS Court held a Disposition Hearing for [Mother] at which time [Child] was removed from [Mother]. He had been removed for at least six (6) months prior to the termination proceeding being filed.

5. [Child] has been removed from [Father] and has been under the supervision of the IDCSMC for at least fifteen (15) months of the most recent twenty-two (22) months.

6. At the time [Child] was detained at the beginning of the ChINS case he was behind on his immunizations and did not have a primary care doctor. He had delays in his speech and motor functions and was referred to speech and occupational therapies.

….

33. [Father] was incarcerated from the beginning of the ChINS case, on a conviction of Robbery as a Class C Felony, until July of 2012, by which time a Petition for Termination of Parent-Child Relationship had been filed.

34. The IDCSMC voluntarily dismissed that termination action to give [Father] a chance to undergo services and be reunited with [Child].

35. No evidence of [Father] participating in any services, classes or programs while incarcerated was presented at trial in this matter.

36. On October 10, 2012, [Father] was ordered to participate in a domestic violence assessment, follow all recommendations, complete a substance abuse evaluation and follow all recommendations, continue working with home based services, complete a parenting assessment and follow recommendations, work towards a GED and participate in the Fathers and Families Program.

37. [Father] was arrested and re-incarcerated in February of 2013, where he remains.

38. [Father] has a trial set on August 22, 2013 on his current pending charge of Firearms Possession by Serious Violent Felon as a Class B Felony.

39. [Father] has a violation of parole. Parole is set to end on December 25, 2013.

40. Prior to being incarcerated [Father] consistently participated in the home based services referral through Dockside and case management at Adult and Child Mental Health, but failed to begin therapy at Gallahue Mental Health after Dockside.

41. Prior to being incarcerated [Father] consistently visited with [Child]. The visits went very well with only a few safety concerns.

42. [Father] completed a parenting assessment.

43. [Father] attended a substance abuse assessment which initially recommended outpatient treatment. Substance abuse treatment was later changed to intensive outpatient treatment.

44. [Father] failed to attend treatment and was unsuccessfully discharged from the program on February 5, 2013.

45. [Father] failed to complete a domestic violence assessment.

46. [Father] was inconsistent in his attendance in the Fathers and Families Program. The twelve week program was referred in July of 2013 but was not completed.

47. The urgency of completing services was made clear to [Father] during the seven months he was available between incarcerations.

48. There is a reasonable probability that the conditions that resulted in the removal and continued placement of [Child] outside the home will not be remedied by [Father]. He was incarcerated at the beginning of the ChINS case and is again incarcerated. He failed to consistently follow up on services, except for home based counseling and visits, during the seven month period he was available. [Father's] ability to safely parent is unknown until after substance abuse and domestic violence treatment which he failed to do.

49. [Child] has been in foster care for over two and one-half years and [Father] is not in a position to offer [Child] permanency now or in the near future. Even if released forthwith, there are still services to successfully complete. Continuation of the parent-child relationship poses a threat to [Child's] well-being by posing as a barrier to obtaining permanency for him through adoption.

50. [Child] has been placed in the same foster home since his removal. This placement is pre-adoptive. [Child] has been observed as being comfortable in his placement and as having bonded with his caregiver and other family.

51. Termination of the parent-child relationship is in the best interests of [Child]. Termination would allow for [Child] to be adopted into a stable and permanent home where his needs will be safely met.

52. Family Case Manager Michelle Jeffries believes there is a risk of harm to [Child] is permanency is not achieved at this time.

53. Given [Mother's] lack of success in services, [Father's] unavailability and his not taking the opportunity to complete services when he could, and [Child's] placement for two and one-half years in the only family where he has enjoyed consistency, Guardian ad Litem Jamie Walden agrees with the plan of adoption as being in [Child's] best interests.

54. There exists a satisfactory plan for the future care and treatment of [Child], that being adoption.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED : that the parent-child relationship between [Child] and his parents [Mother and Father] is hereby terminated.

Appellant's App. pp. 18, 20-22.

## DISCUSSION AND DECISION

The Fourteenth Amendment to the United States Constitution protects the traditional

rights of a parent to establish a home and raise his children. *Bester v. Lake Cnty. Office of*

7

*Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id.* However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Therefore, parental rights are not absolute and must be subordinated to the child's interest in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id.*

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id.* Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.*

Father contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating his parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports

the findings, and, second, whether the findings support the legal conclusions. *Id.*

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id.*

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

(A) one (1) of the following exists:
  (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
  (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
  (iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
(B) that one (1) of the following is true:
  (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
  (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
  (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). Specifically, Father claims that DCS failed to establish that the conditions that resulted in Child's removal or the reasons for his placement outside of his care will not be remedied and that continuation of the parent-child relationship posed a threat to the well-being of Child We note that Indiana Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive, so the juvenile court need only find *either* that the conditions resulting in removal would not be remedied or that the continuation of the parent-child relationship posed a threat to the child. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Thus, we need only address Father's first contention on appeal.

In order to determine that the conditions that led to from the parent's care will not be remedied, the juvenile court should first determine what conditions led DCS to place Child outside of Father's care, and, second, whether there is a reasonable probability that those conditions will not be remedied. *In re S.P.H.*, 806 N.E.2d at 882. When assessing whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside his parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for his child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798

10

N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)).

When considered as a whole, we conclude that the evidence is sufficient to demonstrate a reasonable probability that the conditions which resulted in Child's continued placement outside Father's care will not be remedied. Father was incarcerated for much of the pendency of this case and was incarcerated at the time of the termination hearing, awaiting trial for two Class B felonies, a Class D felony, and a Class A misdemeanor. Father's criminal history indicates a likelihood that he will continue to commit criminal acts in the future and endure additional periods of incarceration. Father's issues with substance abuse are largely unknown, but it may be inferred that he has issues, as he was ordered to participate in intensive outpatient treatment following a substance abuse assessment. There is no indication that Father has provided, or is able to provide, for Child's needs, including food and shelter. During Father's periods of incarceration, he did not participate in services. When the importance of compliance with services was stressed to Father, he failed to fully participate, even when he was *not* incarcerated. Father failed to (1) complete home-based services, (2) begin therapy, (3) attend substance abuse treatment, (4) complete a domestic violence assessment, (5) complete Fathers and Families, (6) obtain stable housing and employment, (7) provide an address to FCM Jeffries, and (8) provide proof of employment. Given the evidence of Father's history of criminal activity, lack of support, and failure to fully participate in services, we cannot say that the trial court abused its discretion in

11

concluding that there was a reasonable probability that the reasons for Child's removal will not be remedied. Father's claim effectively amounts to an invitation for this court to reweigh the evidence, which we will not do. *See In re S.P.H.*, 806 N.E.2d at 879. Under these circumstances, we cannot say that the juvenile court erred in determining that DCS established that it is unlikely that the conditions resulting in Child's placement outside of Father's care would be remedied. *See In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997).

The judgment of the juvenile court is affirmed.

MATHIAS, J., and PYLE, J., concur.